## Case No. 17,436.

WESTERN INS. CO. et al. v. The GOODY FRIENDS.

[1 Bond, 459.] [1]

District Court, S. D. Ohio. June Term, 1861.

COLLISION—RULES OF RIVER NAVIGATION—LOOKOUT ON DECK—PRESUMPTION OF FAULT.

1. By the well-established rules of navigation on the Western rivers, an ascending boat has the right to indicate a preference as to her course of navigation, and having done so, the descending boat is bound to conform to her choice as indicated by her signals, unless there are circumstances rendering it improper to do so.

2. If there are such circumstances, it is the duty of the descending boat so to indicate that the other boat may be navigated accordingly.

3. It is a paramount law of navigation that a collision must be avoided when it is practicable to avoid it.

4. The errors and faults of one boat will not justify another boat in the infliction of an in-

jury to her, unless it was the result of an inevitable necessity.

5. In a case arising from a collision of boats, it is not enough to relieve from an imputation of fault that there was a pilot in the wheelhouse, but there must be some one on deck, charged with the special duty of keeping a vigilant lookout, not in the wheel-house, but on the forward part of the deck, where the best opportunity is offered for observing approaching and passing boats, and who will be able to communicate promptly to the pilot such information as he may need to insure the safety of his boat.

6. The absence of such lookout justifies a prima facie presumption of fault and makes it incumbent on the party against whom the presumption arises, to repel it by clear proof that the fault was on the other side.

Lincoln, Smith & Warnock, for libellants.
Dodd & Huston, for defendants.

LEAVITT, District Judge. This is a suit in rem against the steamboat Goody Friends, prosecuted in the names and for the use of the Western Insurance Company and the Firemen's Insurance Company, both doing business at Cincinnati, to recover damages for a collision, by means of which the steamboat South Bend was sunk, and is a total loss. The libellants were insurers to the amount of $9,000, on the boat, and also on portions of the cargo, and both having been abandoned by the owners, the libellants have paid the amount of their respective risks, being in the whole about $10,000. The libel contains the usual allegations, that the collision was the result solely of the fault of those having the management of the Goody Friends. The owners of this boat have intervened, and in their answer aver that there was no fault in the navigation of their boat, and that the collision is chargeable solely to the unskillful management of the South Bend. Although the parties have taken a large mass of evidence, to which I have given a very careful consideration, the points involved in this controversy are not numerous; and in stating the conclusions at which I have arrived, I do not propose a very full or critical analysis of the facts. As usual in collision cases, there is conflict in the evidence adduced by the parties, as to the course of the boats immediately preceding, and at the time of the collision, and also as to the place at which it occurred.

The collision took place between five and six o'clock, in the morning of December 13, 1860, in the Mississippi river, some forty miles above Memphis, nearly opposite the lower end of Island No. 36. The South Bend, a stern-wheel boat of about 275 tons burden, and having on board a cargo estimated at about two hundred and fifty tons, had been laden at Cincinnati, and was destined for different ports on the Arkansas river. The Goody Friends is also a stern-wheel boat, of about the same class as the South Bend, and was on an upward trip from New Orleans to Cincinnati, and other ports and places above, fully laden with a cargo of cotton and other products of the South. The morning in

[1] [Reported by Lewis H. Bond, Esq., and here reprinted by permission.]

which the collision happened was dark and misty. The stage of water at the time was sufficient for safe navigation, there being between thirteen and fourteen feet in the shoalest channels of the river. The Mississippi, at the place of collision, was at that stage of water, something more than four hundred yards in width. On the Arkansas side, there was a bar some five miles in length, and on the Tennessee shore, there was a deep bend corresponding nearly to the curvature of the bar on the opposite side. The proof is full and clear, that from the outer line of the bar to the Tennessee shore, the water is deep, and sufficient for the safe navigation of boats of a much larger size than the South Bend or the Goody Friends. The depth of the river where the South Bend sank is not less than thirty feet.

The theory of the collision, as claimed by the libellants, is, that when the boats were distant from each other about one mile, or a mile and a half, the pilot of the South Bend noticed the Goody Friends ascending, as he supposed, along or near to the Tennessee shore, and shortly after he heard from her a signal of one blow of the whistle, indicating her intention to keep up that shore, and that the South Bend should take the other side; and that the pilot of the South Bend responded to this signal by one blow of his whistle, signifying his acceptance of the Goody Friends' signal; and that in accordance with these signals, he steered his boat quarteringly toward the bar on the Arkansas side, and that while thus steering, the Goody Friends turned nearly square across from the Tennessee shore, and struck the South Bend with her stern on the larboard bow between the forward hatch and the fire-doors, making a large hole in her hull, which admitted such a rapid inflow of water that she sunk in from two to three minutes after the collision.

On the other hand, the respondents allege and insist, that they have clearly proved that the Goody Friends, when her pilot first saw the South Bend, the boats then being a mile and a half apart, was coming up the Arkansas shore, the usual place of an ascending boat, and gave two distinct blows of his whistle to indicate his wish to keep up that shore, and that the South Bend should keep the other side. This signal, the respondents allege, was replied to by two distinct blows of the whistle of the South Bend, indicating the acceptance of the signal of their pilot, and that under these signals it was the plain duty of the South Bend to have kept down the bend near the Tennessee shore; but that in violation of the signals and the rules of navigation, her pilot steered his boat along the bar, and at a point not exceeding one hundred yards from the bar, and very near the proper place for an ascending boat, came in contact with the Goody Friends. thereby making a hole in her bow which caused her to sink immediately.

From this statement, it is apparent the theories of the parties, as to this collision, are in direct conflict; and, it is clear, that both can not be true. And it becomes the duty of the court, in the light of the evidence, to determine which way the scale shall preponderate. In this inquiry it is important to ascertain what signals passed between these boats. The only witness on this point for the libellants is Squire Patterson, the pilot of the South Bend, on duty before and when the collision took place. He states, in substance that he discovered the Goody Friends when a mile or a mile and a half below, coming up, as he supposed, in the Tennessee bend. He says he thought then she was in the wrong place for an ascending boat, and supposed it was her intention to land at a wood-yard in the bend; and that he heard one whistle from the ascending boat, to which he replied by one blow of his whistle; and according to these signals, steered his boat quartering toward the bar, supposing it was the purpose of the other boat to keep the Tennessee shore. And this would have been correct navigation if the signals had been as he states he understood them. But the court is forced irresistibly to the conclusion, that Patterson, either from misapprehension or design, has not stated the truth in regard to the signals that passed between these boats. Harrison, who was the pilot of the Goody Friends, states that the signal from his boat was two distinct blows of her whistle, indicating his wish to keep the usual place of an ascending boat, near to the Arkansas bar. Logan, who was with Harrison in the wheel-house, a pilot of long experience on the river, states that he gave two loud and distinct whistles, by the direction of Harrison. And both these witnesses say that the response to their signal from the South Bend, was two loud and distinct whistles. These statements are corroborated by other witnesses—one of whom was on the South Bend—and leave the evidence of Patterson wholly without support. It is also clear that he was altogether mistaken in his conclusion that the Goody Friends was coming up the Tennessee bend when her pilot first gave his signal. The testimony, as well as the probabilities of the case, sustain the inference that she was on the Arkansas side when the signal was given.

By the well-established rules of navigation on the Western rivers, the ascending boat has a right to indicate her preference as to her course of navigation. And, having done so, the descending boat is bound to conform to her choice as indicated by her signals, unless there are circumstances rendering it improper for her to do so. And if there are such circumstances, it is her duty so to indicate, that the other boat may be navigated accordingly.

This view of the evidence leads to the conclusion, beyond any reasonable doubt, that the pilot of the Goody Friends gave the proper signal, at the proper time, indicating his purpose of keeping up the Arkansas shore, and his desire that the descending boat should run down

on the other side. There is no controversy as to the right of the ascending boat thus to make known her preference; and it is clear that the descending boat, having accepted this signal, was bound to run in accordance with it. That the South Bend was not so navigated is established by the testimony of the witnesses before referred to, who concur in saying that she did not keep down the Tennessee shore, but kept nearer the Arkansas bar than the other shore. Indeed, it would result from the evidence of Patterson, the pilot of the South Bend, that such was his course of navigation. It was in accordance with what he says he understood the signals to require.

But if there was any doubt upon this point, there is one fact in the case that renders it entirely certain. I refer to the position of the wreck of the South Bend. It is true, there are several witnesses—some eight or nine in number—who express the opinion that the wreck is near the middle of the river, somewhat nearer the Arkansas than the Tennessee shore; but, on the other hand, there are eleven witnesses who locate the wreck at from seventy-five yards to one hundred yards from the Arkansas bar, and between three and four hundred yards from the Tennessee side. And they concur in the statement that it lies very near the usual track of an ascending boat. The great discrepancy in the estimates of the distance of the wreck from the bar as given by some of the witnesses for the libellants, and those examined by the respondents, is not easily accounted for. There is undoubtedly a wide difference in these estimates. And there is no reason to infer that the witnesses for either party have intentionally falsified the truth. Of the eleven witnesses who were offered by the respondents and interrogated on this point, there is an entire concurrence of opinion that the wreck lies much nearer the Arkansas than the Tennessee shore; and while they differ to some extent in their estimate of the distance, they are unanimous in the opinion that the place of the wreck is very near the line of navigation of an ascending boat, in that part of the river. This is really the material point of the inquiry; for it results inevitably that if the collision happened upon or near the usual track of an up-stream boat, the South Bend, as a descending boat, was out of her proper place. I can see no sufficient reason for rejecting the testimony of the numerous witnesses for the respondents who have testified on this point. They are men of great practical knowledge and experience in the navigation of the Mississippi, who passed the wreck frequently, both in ascending and descending the river. They had the best means of forming a correct judgment of its location, and of deciding whether it was, or was not, near the course of an up-stream boat. And they have testified on this point, with great intelligence, and without any motive, from interest or otherwise, to misrepresent the facts. Some of them state distinctly that the wreck was so near to the Arkansas bar that they deemed it unsafe in ascending to run their

boats between the wreck and the bar. Without, therefore, going into a more minute examination of the evidence on this point, I can not hesitate to conclude that with reference to the signals, as proved to have passed between these boats, the South Bend was in fault in not keeping down the bend, at a distance not exceeding one hundred and fifty yards from the Tennessee shore.

To avoid the inference of fault in the navigation of the South Bend in not keeping the proper course of a descending boat, as indicated by the place of the wreck, it is insisted by the libellants that the South Bend was moved by the force of the blow received from the other boat some yards or more from the place of the collision toward the bar, and that this explains, in part, the proximity of the wreck to the bar. The witness, Patterson, states that the South Bend moved from fifty to one hundred yards after the collision before she sank. But this statement is not sustained, either by the evidence or the probabilities of the case. While it is undoubtedly true that the Goody Friends struck the South Bend with great violence on the larboard side, a little forward of the boilers, and as the result her stern swung quickly round, so that the boats were side by side, with their bows pointing up stream, it is impossible to conceive that the effect would be to move the stricken boat any considerable distance toward the bar. She was heavily laden, and sunk in two or three minutes after the boats came together. The intelligent experts who have been examined on this point state explicitly that the South Bend could not have moved half her length between the time of the collision and the time she sank.

It is insisted by the proctor for the libellants, that the pilot of the South Bend navigated his boat in accordance with the signals as he understood them, and therefore was not in fault in keeping down near the bar. But as already remarked, Patterson is not sustained in his statement as to the signals; and as other persons on both the boats swear positively that there were two loud and distinct whistles from each of the boats, I am slow to believe that he had any ground for inferring that the signals were as he says he understood them. But, if it is conceded that he was at the moment under a misapprehension as to the signals, he failed in his duty as a vigilant pilot in not sooner ascertaining and rectifying his mistake. He states that the boats were about a mile or a mile and a half apart when he first discovered the Goody Friends, and that in a minute or two after he heard her signal. After the signals had passed, they were probably near a mile apart. Whatever may have been his impression before as to the position of the ascending boat, an attentive observation of her course would have satisfied him that she was coming up the bar shore; and, if he had a doubt on this subject, he should have stopped his engine and repeated his signal. There was time enough

to have done this before the boats were in dangerous proximity. But he failed altogether to repeat his signal, and only gave the order to stop and back when the boats were but four hundred yards apart, and when it was too late to avoid the collision. There was in this a failure of vigilance and of prompt action, that puts him clearly in the wrong.

It is urged, however, by the libellants, that if the South Bend was in fault in the particulars referred to, there were also faults in the management of the Goody Friends of sufficient magnitude to constitute this a case of mutual fault calling on the court for a decree apportioning the damages to each of the boats, in accordance with the familiar doctrine of admiralty in such cases. I will therefore briefly consider this point. It has already been stated that the Goody Friends, in coming up the Arkansas bar, was navigated not only in accordance with the signals which passed, but according to usage of the river as observed by pilots at that place. It seems clear, however, that the pilot is justly chargeable with the same want of vigilance and promptness, which is imputed as a fault to the other boat. When he noticed, as he was bound to notice, that the South Bend was pointing toward the Arkansas bar, and not going down the Tennessee bend, as the signals required, it was his duty to have repeated his signals, and to have stopped his boat, until he should obtain a proper understanding of the intention of the pilot of the descending boat. As in the case of the South Bend, so in that of the Goody Friends, there was time enough to have done this, and there is no sufficient excuse for not having done it.

But there is another question of graver import, and, perhaps, of more difficulty than any of those which have been noticed. That question is, whether the Goody Friends was not in fault in not stopping and backing before the boats were so nearly in contact, as that a collision was inevitable. The evidence is very clear, that the orders of the pilot first to stop, and then to back, were not given until it was too late to put the latter order in execution. The engineer of the Goody Friends states positively, that when the order to back was received by him, there was no time to back, as the boats were then in close proximity, and that his engine was not reversed at all. There seems to be no reasonable ground for doubt, as to the course and position of the boats at the time of the collision. It is impossible to account for the character of the injuries to the boats, without supposing that when they came together, the South Bend was quartering toward the Arkansas bar, and that the Goody Friends in her upward course, at a greater or less angle, was pointed toward the bar. There is, therefore, no foundation for the theory urged by the respondents, that the bows of both boats were quartering up stream when they came together. It is impossible from the evidence before the court to conceive that the boats could have been in such a position. Pat-

terson swears that the Goody Friends struck his boat nearly at right angles, and that her course was nearly square across the river at the time. In this, however, he is contradicted by the witnesses for the respondents. And, if the manner of their approach, and the angle at which these boats came in contact, depended on the evidence solely of those who profess to have been eye-witnesses of the transaction, I should have been in great doubt as to these facts. Probably the weight of the testimony would have preponderated in favor of the respondents. But there is evidence in the case, which, if credible, must be conclusive of two facts: first, that the Goody Friends was nearly, if not altogether, under full headway when she struck the South Bend; and second, that she came into her nearly at a right angle. The evidence to which I refer is that of the witness Rooney. He was in the employ of the Missouri Wrecking Company, as a submarine diver, and with a boat and the usual apparatus for that purpose, visited the wreck a few days after the collision, with the view, if practicable, of raising the boat, and recovering the cargo. In this capacity, by means of a diving bell, Rooney made repeated visits to the sunken boat, fully explored every accessible part of the wreck, and succeeded in saving parts of the cargo. He states that he examined the breach made in the South Bend by the collision, and describes it as extending from fifteen to twenty feet along the larboard guard and upper portion of the deck, and downward some four feet below the water-line, and within a short distance of the knuckle, and inward about twelve feet, or two-thirds of the distance from the outer edge of the boat to the kelson, and that the whole breach is triangular in shape, the widest opening being at the top. He also states that the point where the Goody Friends struck the South Bend was on the larboard side, between the front end of the boilers and the forward hatch. He also testifies that the planks of the boat along the outlines of the break were not smashed or pushed in, and that, in his language, it is a clean cut. He gives it unequivocally as his opinion, that the South Bend was struck by the stem of the Goody Friends, nearly square, or at a right angle, and moreover, that she struck with great force. This he infers from the character of the cut or break, and the effect produced on such parts of the cargo as were struck by the stern of the boat in its inward progress. He states that a box on the deck of the South Bend, containing hardware, being mostly tools and implements of iron, was penetrated and split by the force of the blow, and also other facts, tending to prove the great violence of the collision.

These are probably all the facts stated by this witness to which it is material to refer. If he is credible, the facts which he states justify the conclusion already indicated as to the character of this collision. And there is nothing before the court impeaching the credibility of his evidence. His manner as

a witness indicated intelligence and candor. He has no interest in the event of this controversy, and so far as the court can know, no motive to depart from the line of truth. From his own statements, he has been long employed, as a diver, in raising sunken boats and cargoes, and seems to be entirely familiar with such operations. It is true, that in his explorations in this department, he has not the advantage of an ocular sight of the objects with which he has to deal in the water. The turbid water of the Mississippi does not enable him to see those objects, and he is necessarily guided in his explorations and labors solely by the sense of feeling. But an intelligent and experienced diver would probably find no difficulty in determining the forms and dimensions of the submerged subjects of his examination. In a word, I can perceive no sufficient reason for repudiating the evidence of the witness Rooney. That this testimony has an important bearing on a vital question connected with this controversy, is too clear for doubt. It throws a strong light on the inquiry as to the actual position of the boats at the moment of collision, and the probable angle at which the Goody Friends approached and ran into the South Bend. And thus viewed, it relieves the case from some of the doubts, in which the other evidence involved it.

It is too clear for controversy, that although the previous navigation of the South Bend was faulty, and she was not in the proper place of a descending boat, yet if it was in the power of the other boat to have avoided the collision, and from negligence or want of skill her pilot failed to do so, she must be held responsible for the consequences. It is a paramount law of navigation, that a collision must be avoided when it is practicable to avoid it. That one boat has been guilty of errors or faults will not justify another boat in the infliction of an injury to her, unless it was the result of an inevitable necessity. If, therefore, in the present case, the pilot of the Goody Friends, as these boats neared each other, and the danger of a collision was imminent, neglected any measure of precaution within his power, which, if resorted to, would have prevented it, or rendered it harmless, his boat must bear a portion of the responsibility of the injury. As before noticed, the respondents' theory of the collision is that the South Bend suddenly came out from the Tennessee shore, and steered nearly straight across the river, striking the Goody Friends nearly at right angles. But Rooney's evidence clearly contradicts this theory. It is impossible the break he describes could have been made in that way. On such a supposition, the break would have been made in the starboard side of the Goody Friends by the stern of the South Bend striking and cutting into her, whereas, the break was on the larboard side of the South Bend, between the fire-doors and the forward hatch. This strongly sustains the claims asserted by the libellants. The South Bend must have been pointed down stream at the time, quartering, perhaps, toward the bar, and while in this position the Goody Friends must have struck her, with force sufficient, and at such an angle, as to have made the clean inward cut described by Rooney. This conclusion is fortified by the fact which is clearly proved, that the South Bend, at least three minutes before the collision, had been backed, and had very little, if any, headway when struck. On the other hand, it is clearly established that the headway of the Goody Friends had not been checked, and that the entire force expended in the collision proceeded from her.

And now the question presented is, was it in the power of the pilot of the Goody Friends to have prevented the collision by stopping and backing his boat at the proper time? In this connection, it may be remarked that it is in accordance with the expressed opinion of one witness, sustained by the strong probabilities of the case, that if the latter boat had stopped and backed as soon as did the South Bend, either the collision would not have occurred, or, if it did occur, would have produced no injury to either boat. The witnesses, Harrison and Logan, who were in the pilot-house, say they did not notice when the South Bend started across from the Tennessee side. This certainly proves a want of vigilance on their part. It was their duty to have watched every movement of the descending boat till all danger of collision had passed away. But a still more glaring neglect of duty is found in the fact that when they became aware that the South Bend was crossing toward them, and that there was danger of a collision, they waited one minute before the order was given to stop and back. Now, if the Goody Friends was running at the rate of seven miles an hour, she would have run about two hundred yards in that minute, and would have been by that distance nearer the other boat than when the danger was perceived. The value of one minute of time, under these circumstances, can be readily appreciated. If the order to back had been given and obeyed one minute sooner, the headway of the boat would have been nearly, if not wholly, checked, and this disastrous collision would have been prevented. When the order was given, the boats were so near that the engineer of the Goody Friends states there was no time to back, and that his engine was not reversed. I can come to no other conclusion than that this delay in backing was the immediate cause of the collision, and that there is nothing in the facts of the case which excuse it. It involved the omission of a plain duty, and was not a merely harmless error.

In addition to the evidence referred to, sustaining, in my judgment, the conclusion that there was a culpable want of promptness in stopping and backing the Goody Friends, there are two collateral considerations which have significance as warranting the presump-

tion of fault in the management of that boat. The first is, that there was no sufficient lookout or watch on her deck prior to and at the time of the collision; and second, that the pilot was not competent or trustworthy.

As to the first point stated, there is no controversy as to the facts. It appears clearly from the evidence, that from the time the boats came in sight until after the collision, there was no one on the deck of the Goody Friends, except Harrison, the pilot, and Logan, and they were both in the pilot-house. Although the night was very dark, and the signals had given notice that a boat was approaching, the master was in his berth, and was only roused from his slumbers by the crash of the collision. The mate, whose watch it was, had deserted his post on deck, and was below warming himself at the stove, apparently giving no attention whatever to the navigation of the boat. Now, it has been several times ruled by the supreme court, and recognized by this court as law in collision cases, that it is not enough that there is a pilot in the wheel-house, but there must be some one on deck charged with the special duty of keeping a vigilant lookout, and that his proper position is not in the wheel-house, but on the forward part of the deck where the best opportunity is offered for observing approaching and passing boats, and who will be able to communicate promptly to the pilot such information as he may need to insure the safety of his boat. The cases sustaining this rule have been so often cited by this court as to render a special reference to them altogether unnecessary. The importance and pertinency of the rule, as applicable to the case before the court, will be apparent from the fact stated by Harrison and Logan as the only reason for not having sooner given the order to back, that in the wheel-house the view of the South Bend was temporarily intercepted by one of the chimneys of the Goody Friends, so that they were unable to determine the exact course of the former boat. While it is most probable this fact is stated as a mere excuse for the delay which occurred in giving the order to back, it is obvious that if such a difficulty had any existence in fact, it would have been obviated by the vigilance of a faithful lookout stationed on the forward part of the deck.

In regard to the incompetency of the pilot Harrison, there are some pertinent facts in evidence. It is in proof that he has a good deal of experience and knowledge as a pilot, and in former years was regarded as entirely competent and trustworthy in his profession; but for several years past his habits have been those of a very intemperate man, and as a result of his habits he has not been able to find regular employment as a pilot. This fact, of itself, casts suspicion on his competency and trustworthiness. In addition to this, it is proved that he was in a state of great excitement when he went aboard of the Goody Friends at Memphis, in the even-

ing of the 12th of December, and was then, as some of the witnesses thought, in a state of intoxication. It is also proved that he was continuously on duty as pilot from the time the boat left Memphis, between seven and eight o'clock in the morning, until the occurrence of the collision the next morning, between five and six o'clock, with the exception of some seven or eight miles, during the running of which Logan had charge of the wheel, but Harrison stood by his side in the wheel-house. It is also proved by a witness, who was master of a boat which passed the Goody Friends during the night, that his attention was drawn to her by the wildness and unsteadiness of her movements. It may be proper to remark, that the facts that there was no sufficient lookout on the Goody Friends, and the doubtful competency and trustworthiness of the pilot, are not referred to as conclusive evidence that the fault of this collision is to be charged to that boat. They would not be sufficient to repel or overcome clear evidence that the collision was due solely to the mismanagement of the other boat. But, in the light of the authorities referred to, they justify a prima facie presumption of fault, and make it incumbent on the party against whom this presumption arises, to repel it by clear proof that the fault was on the other side.

As already intimated, the facts in this case prove with reasonable certainty that there were faults in the management of both of these boats, and that it is a proper case for the division of the damages which resulted from the collision. The specific acts of unskillfulness and negligence fairly chargeable to each, may be briefly stated as follows: The pilot of the South Bend was in fault: first, in crossing toward the bar on the Arkansas side, and attempting to descend at or near the place of an ascending boat, in violation of the signals which had been given, and of the usages of navigation applicable to that part of the river; second, if he misapprehended the signals and supposed them to have been different from what the evidence shows they were, he was in fault in not having sooner ascertained his mistake, and in not stopping his boat at once, and calling for a repetition of the signals to ascertain what was desired and intended by the ascending boat. The pilot of the Goody Friends was also in fault: first, in not exercising a proper vigilance in correcting the apparent misapprehension in regard to the signals, by stopping his boat in time and repeating his signals until there should be right understanding between the boats; second, in continuing under full headway until the boats were so near that a collision was inevitable, and neglecting to give the order to back until from the close proximity of the boats it was impossible to execute it; third, it is clear from the evidence, that there was no one on the deck of the Goody Friends for some time prior to, and at the time of the collision, charged with the

special duty of keeping a vigilant lookout, and giving the pilot timely information of any obstruction, difficulty, or danger in the navigation of his boat.

A decree will therefore be entered on the basis of mutual fault. But as it appears there was some injury sustained by the Goody Friends, and also some detention resulting from the collision, in relation to which I am not aware that there is any evidence before the court, the court will either now hear the evidence, or refer it to a commissioner to ascertain the injury suffered by that boat. If, however, the counsel can agree upon the amount, it will supersede the necessity of either course. This amount will be deducted from the loss sustained by the libellants, and a decree will be entered against the Goody Friends for one-half of the balance, with interest from the date of the collision.